**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Felix Joseph VICKNAIR, Robert Girard Vicknair, James Edward Picker, Thomas D. Morgen, Fred Mell, Edward Kline, Russell Joe Kersting, Joseph Kersting, George Christ Karanicas and Frank S. Buckbee, Defendants-Appellees.**

No. 78–3561.

United States Court of Appeals,
Fifth Circuit.

Jan. 25, 1980.

Barbara D. Schwartz, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellant.

Joel Hirschhorn, Miami, Fla., for F. J. Vicknair and R. G. Vicknair.

Daniel S. Pearson, Miami, Fla., for defendants-appellees.

Before GODBOLD, GEE and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Police officers illegally went on private property in an exclusive suburban Miami neighborhood because they suspected it was being used for smuggling. Two weeks later, in an early morning raid on the same home, they seized nearly 30,000 pounds of marijuana and arrested the persons found on the property. Subsequently, the persons arrested were charged on a three count indictment with conspiracy to import and possess marijuana with intent to distribute, importation of marijuana and possession with intent to distribute.[1] The issue is

1. The defendants-appellees were charged under 21 U.S.C. §§ 841(a)(1), 952(a), 960(a)(1) and 963.

whether the prior entry spread taint sufficient to require suppression of the product of the later seizure.

After hearing testimony and argument on a motion to suppress both the evidence seized during the raid and statements made by some of the defendants after the raid, the district court granted it. The government now asks us to reverse that decision.

## I.

On November 22, 1977, the Coral Gables Police Department received a report from a neighbor of the residence at 9330 Balada Street that the house and grounds were not being well kept and that, although the house appeared uninhabited, boats would arrive in the canal at the rear of the property and people would enter and leave the residence at odd hours of the day and night. After preliminary observation of the house and a boat docked behind it, the police discovered that the house was titled in the name of Alvero Cabrera and the boat, the "Sky Top II," was owned by the FBV Corporation. The investigation also revealed that the "Sky Top II" and Felix B. Vicknair, president of FBV Corporation, were suspected by federal authorities of involvement in marijuana smuggling.

On November 23, the Coral Gables Police Department set up a 24-hour surveillance of the residence and the boat. The surveillance continued until the morning of November 25. During that time no suspicious activities were observed at the house or on the boat. On the morning of November 25, the police, accompanied by a Customs officer, decided to call on the occupants of the premises and, if possible, to search the "Sky Top II" for contraband. The party were in mufti but, accompanied by a uniformed officer, drove to the front of the residence in a marked police car. Unable to obtain an answer to their knocks on the front door, the members of the party went around the house and across the backyard to the Sky Top II. They then boarded the vessel and conducted a search that the government concedes was illegal. They observed that, although the exterior of the vessel gave the impression that it was a pleasure craft, the interior was messy, the carpets were rolled up and it had few of the normal accouterments of luxury. However, they found no signs of contraband.

The officers left the vessel and proceeded to the back of the residence where they entered its screened-in patio, circled its swimming pool and knocked on the back door. They received no response and, finding that the drapes and shutters prevented them from seeing inside the residence, they left. On their way back to the police car they detected what they believed to be the odor of marijuana coming from an air conditioning vent on the side of the house.

The Police Department thereafter continued its investigation of 9330 Balada, but reduced its surveillance to intermittent spot checks of the house and boat. On December 13, they received information that the "Sky Top II" had left its dockage. They staked out the house and began a helicopter search of the coast. Small craft warnings were announced, so the weather was not favorable for pleasure cruising. Therefore, after five hours of fruitless searching, the police concluded that the vessel had gone to sea to pick up marijuana, and they assembled a task force of police officers.[2] When the vessel returned after midnight on December 14, the police observed a human chain unloading bales from the vessel, so the task force moved in and made the arrests and seizure.

It was established that title to the house was in the name of a straw man and Felix B. Vicknair, the father of the defendants, Felix J. Vicknair, Paul Edward Vicknair and Robert G. Vicknair, was its owner. We find it unnecessary to sum up the evidence concerning how each defendant established his right to be in the house or on the vessel.

2. At the time the decision to gather a task force was made, the vessel had been absent from its mooring for the longest period of time noted by the police since they began surveillance on November 23.

We set forth in a footnote the contentions made in the defendants' brief.[3] It suffices for present purposes to accept their testimony that each had an invitation or permission from Felix Vicknair or from one of his invitees to enter the house or to reside in it or to use the vessel or to stay on it.

3.  a.  *Felix J. Vicknair.* The trial court found that Felix B. Vicknair, this Defendant's father, was the actual owner of the house at 9330 Balada and of the "Sky Top II". This Defendant had his father's permission to use the house, and it was his responsibility to maintain the premises. He performed repairs upon and maintained the "Sky Top II" and had authority to board the boat. He believed the house was either owned or leased by his father and that the lease extended to the dock where the boat was moored. No one could board or use the boat without his father's permission.

    b.  *Paul Edward Vicknair.* He too believed his father, Felix B. Vicknair, either owned or leased the house. He helped maintain both the house and boat and had to receive his father's or brother's (Felix J. Vicknair) permission to permit someone on the boat or to permit someone to use the house. He lived in the house on a part-time basis, both before November 25 and between November 25 and December 14, 1977. He kept clothing in the house and was responsible for its contents and the security of the boat while living there.

    c.  *Robert G. Vicknair.* He believed his father, Felix B. Vicknair, either owned or leased the house. He lived in the house full time during November, 1977, and for five or six months previously. He was responsible for the security of the house and boat. He had to receive his father's or brother's (Felix J. Vicknair) permission to let anyone use the house or boat.

    d.  *Thomas Morgan.* He was married to the daughter of Felix B. Vicknair's girlfriend. On and before November 25, 1977, he had slept on board the "Sky Top II" and used the boat with Vicknair's permission. He had previously stayed in the Balada residence and had permission to stay there. He was permitted to bring his friends to the house and on board the boat.

    e.  *Fred Mell.* During October and November, 1977, including November 25, 1977, he lived in the Balada Street house with Felix B. Vicknair's permission. He kept his clothes in the house. He went on the "Sky Top II" only with Felix B. Vicknair's permission. There had been a break-in at the house two months before November 25, and Mell was living there to assure its security.

    f.  *Joseph Kersting and Russell Kersting.* Joseph A. Kersting was the captain of the "Sky Top II" and responsible for running and maintaining it. He performed mechanical repairs on the "Sky Top II" with the assistance of his son, Russell Kersting, and occasionally with the assistance of Co-Defendant Frank Buckbee. Kersting left his tools and clothes on board the vessel. He shared a key to the vessel with Russell. Kersting did not use the vessel for the purpose of pleasure, although he was permitted to do so. His wife, daughter and son would stay on the vessel while in the area for shopping purposes. Russell sometimes stayed on the boat overnight.

    g.  *James Picker.* Picker was Felix B. Vicknair's son-in-law. He understood that Felix B. Vicknair owned the "Sky Top II," and he had to have his permission to use it. He had stayed at the Balada Street house with Vicknair's permission. He had been on the vessel six or seven times prior to November 25 with friends and family.

    h.  *Edward Kline.* Kline had been on the vessel three times within the three-month period prior to November 25. He went on the "Sky Top II" only with Felix B. Vicknair's permission.

    i.  *Frank Buckbee.* Frank Buckbee performed mechanical work with Joseph Kersting on the "Sky Top II" on about six occasions, for which services he was paid by Felix B. Vicknair. He frequently kept tools and clothes on the vessel. He stayed on the boat several times. He had access to the keys of the vessel so as to be able to perform mechanical repairs on the vessel, but he could not use the vessel at his discretion although he was never prohibited from bringing others with him.

The government contends that, since the search of the premises at 9330 Balada on November 25 was constitutional, the November search did not taint the evidence seized in December and the Fourth Amendment rights of the defendants were not violated by the November search.[4] The dis-

4.  Our standard of review of a judgment granting a motion to suppress in a criminal case is the same as that applicable under Rule 52(a), Federal Rules of Civil Procedure. *See United States v. Cruz,* 5 Cir. 1978, (en banc), 581 F.2d 535, 540–41. If the district judge failed to enter separate findings of fact and conclusions of law, we must ascertain whether there is a reasonable view of evidence in the record to support his disposition of the motion. *United States v. Montos,* 5 Cir. 1970, 421 F.2d 215, 219 n.1, *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532. Here, although the district judge did not make factual determinations on every disputed point in the record, we accept those that he made unless they are clearly erroneous and review other controversies by the *Montos* standard.

trict judge concluded that the November search of both boat and house were illegal, that each defendant had a reasonable expectation of privacy in the areas searched and that the evidence obtained in December was tainted by the November activities.

## II.

The government concedes that the search of the "Sky Top II" was warrantless, unauthorized and not within any exception to the Fourth Amendment. However, it contends that the entry onto the premises of 9330 Balada, although technically trespass, did not rise to the level of a Fourth Amendment violation. It also contends that none of those arrested had a reasonable expectation that what was discovered in November would be private, and that, therefore, none can assert the unconstitutionality of the November entry.

In the normal discharge of their function, police officers must occasionally enter upon private property without the permission of the owner. *See, e. g., Nordskog v. Wainwright,* 5 Cir. 1977, 546 F.2d 69; *United States v. Anderson,* 8 Cir. 1977, 552 F.2d 1296. Police excursions onto private property have been upheld when designed to observe illegal acts through an unobstructed window, *United States v. Johnson,* D.C. Cir. 1977, 182 U.S.App.D.C. 383, 561 F.2d 832, *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080, or to confirm an informant's tip that contraband was hidden in the crawlspace beneath a house, *Giacona v. United States,* 5 Cir. 1958, 257 F.2d 450, *cert. denied,* 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104. The police excursion onto the premises at 9330 Balada, however, was neither entirely innocent nor within the scope of ordinary police routine. The police suspected that the house and boat were being used for marijuana smuggling. Their visit was made to confirm those suspicions. Receiving no response to loud knocking on the front door, they went to the rear of the residence and boarded and searched the "Sky Top II." Discovering no contraband, they then entered an enclosed area of the residential premises and continued · the search with fruitless attempts to peer into closed windows.

The government asserts that the presence of a marked police car and a uniformed officer, the attempts to rouse any occupants of the house and the absence of any clandestine or surreptitious behavior by the police officers define their conduct as a mere trespass, a technical illegality, rather than an unconstitutional search. Such threads of distinction weave too fine a cloth to cover the unconstitutionality of the entry.

A search need not be clandestine to be unlawful. The police crossed the premises with the admittedly illegal purpose of searching the "Sky Top II." If that is not enough to infect the entire entry, their entry into an enclosed area of the premises and their attempts to observe the interior of the house through closed and shuttered windows belies the assertion that their sole purpose was to locate the owner of the premises. The district court was fully supported in concluding that the record painted a picture of warrantless intrusion onto private property to confirm suspicions of illegal activity and to conduct an illegal search of a vessel docked at the rear. The parade of a uniformed officer and marked police car does not mask the background of invalid purpose. The district court was correct in finding the November search unconstitutional.

## III.

To challenge successfully the admissibility of evidence obtained unconstitutionally, a defendant must establish that his own Fourth Amendment rights were violated by the conduct upon which he wishes to base exclusion. *See United States v. Reyes,* 5 Cir. 1979, 595 F.2d 275, 278. The district judge ruled that all of the defendants had a reasonable expectation of privacy in the Balada Street residence and the "Sky Top II" at the time of the November searches. On appeal we are asked to decide whether, indeed, defendants' constitutional rights were violated on November 25. The defendants not only assert that they had a reasonable expectation of privacy, but fur-

ther contend that the "automatic standing" rule of *Jones v. United States,* 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, requires us to conclude that their rights were violated by the November search. Although all parties have dealt identically with the boat and the house, there are significant differences between the legal standards applicable to the entry of each, for reasons we shall discuss, and we must consider them in some respects separately.

## A. Automatic Standing

In *Jones* the Supreme Court held that the government was estopped from denying that an unconstitutional search had invaded a defendant's Fourth Amendment rights when it was charging the defendant with a crime involving possession of the very goods seized during the search. Starting from the implicit premise that the seizure of his property renders both the seizure itself and any unconstitutional search designed to effectuate that seizure an invasion of a defendant's Fourth Amendment rights, *see United States v. Jeffers,* 1951, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59, the Court concluded that the premise was established whenever the government charged a defendant with a crime involving possession of the goods seized. "In cases where the indictment itself charges possession," the Court reasoned, "the defendant in a very real sense is revealed as a 'person aggrieved by an unlawful search and seizure' . . . ." *Jones v. United States,* 362 U.S. at 264, 80 S.Ct. at 733, 4 L.Ed.2d at 704.

The defendants here ask us both to conclude that *Jones* automatic standing is still a valid exclusionary precept and to extend its umbrella to protect against the admission of evidence seized in a later valid search even though the contested search did not produce the evidence seized. Assuming the continued force of *Jones,* we decline to accept the invitation to apply it as a shield against otherwise valid searches.

Although the holding in *Jones* was broadly phrased, subsequent cases have more accurately defined its precept. As later stated by the Supreme Court in *Brown v. United States,* 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208, the "automatic standing" doctrine applies when a defendant is "charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence *at the time of the contested search and seizure.*" *Id.* at 229, 93 S.Ct. at 1569, 36 L.Ed.2d at 214. (Emphasis supplied). Thus, in *Brown* the Court refused to apply the automatic standing doctrine to defendants charged with transporting stolen goods in interstate commerce because the seizure of the goods took place after the time when the defendants were alleged to have had them in their possession.[5]

Similarly, in this case the possession which is an element of the crime with which defendants are charged did not take place until two and one half weeks after the challenged entries. The rationale of the "automatic standing" doctrine is "[w]hen the time of the possession charged and the time of the search coincide or overlap, it is indeed inconsistent for the government to argue the defendant lacked sufficient possession to confer standing to challenge the search but had sufficient possession at the same time for conviction." *United States v. Colbert,* 5 Cir. 1973, 474 F.2d 174, 177. This foundation is absent here. It is entirely consistent for the government to contend that defendants lacked any interest in the areas searched on November 25, but were later in possession of marijuana that subsequently was brought to those premises.

The December events did not result in the seizure of the defendants' property in such fashion that a search and an almost simultaneous seizure were "tied" for pur-

---

5. We note that this court has expressed some doubt about the continued validity of *Jones. See United States v. Reyes,* 5 Cir. 1979, 595 F.2d 275, 279 n. 2; *United States v. Edwards,* 5 Cir. 1978, (en banc) 577 F.2d 883, 892, 896, *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427; *United States v. Archbold-Newball,* 5 Cir. 1977, 554 F.2d 665, 678–79, *cert. denied,* 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496. Nothing in this opinion is to be considered a discussion of that issue, which is evidently not now before us.

poses of determining whether defendants' personal Fourth Amendment rights were violated. *Cf. United States v. Jeffers,* 1951, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59. The length of time between the contested search and the seizure two weeks later, as well as the fact that no evidence was secured against defendants during the earlier search makes the events separate in law as they were in fact. All searches leading to the discovery of the contraband do not per se invade the rights of defendants charged with a possessory offense. Therefore, we conclude that the defendants do not have automatic standing to contest either the December seizure or the November entries.

■ To justify exclusion of the evidence seized in December each defendant must establish that he had a reasonable expectation of privacy in the boat and the house in November before we can conclude that there was an unconstitutional invasion of their privacy and extend that to infect the December events. The district judge decided that such an expectation had been shown. Because this is a legal conclusion involving substantive Fourth Amendment analysis, *see Rakas v. Illinois,* 1978, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, it is subject to full review by this court. The conclusion rests, however, upon several factual premises that are supported by the record and, therefore, are binding on us: each of the defendants had permission from some other defendant or from Felix B. Vicknair to use the "Sky Top II" and be upon the Balada Street property and several of the defendants stayed on the vessel from time to time, both day and night, or lived in the house.

B. *The Sky Top II*

■ Assuming these factual premises to be correct, and viewing the evidence in the record as favorably as possible to defendants, we conclude that no defendant had a reasonable expectation of privacy in the "Sky Top II." The fact that defendants were associated together in an illegal enterprise does not alter the focus of our inquiry. We must look to each defendant's individual privacy or property interest in the premises searched to determine whether the search invaded his substantive Fourth Amendment rights. *See United States v. Dyar,* 5 Cir. 1978, 574 F.2d 1385, 1390–91, *cert. denied,* 439 U.S. 982, 99 S.Ct. 570, 58 L.Ed.2d 633; *United States v. Hunt,* 5 Cir. 1974, 505 F.2d 931, 939, *cert. denied,* 1975, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466.

The "Sky Top II" did not belong to any of the defendants. It was the property of a corporation, FBV Corporation; while Felix B. Vicknair is identified as president of the corporation, the record contains no evidence of corporate action that would give any defendant a reasonable expectation of personal privacy while he was on or was using corporate property. The issue is not the legality of the defendants' presence on the vessel but whether presence even by direct invitation of the corporate executive is equivalent to a legitimate expectation of privacy in the area. *See Rakas v. Illinois,* 1978, 439 U.S. 128, 142, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 400. Nor would it have been sufficient, had it been shown, that a particular defendant may actually have expected privacy on the boat as a result of the invitation, for "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* at 143 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 401 n. 12. We can find no such source to legitimate defendants' expectations here.

■ Several of the defendants who hold shares in the FBV Corporation assert this proprietary interest as a partial basis for their privacy claims in the vessel. Whatever Fourth Amendment interests the corporation may have in the "Sky Top II," however, do not aid the stock-holding defendants here. When corporate property is seized or searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the goods seized or the area searched. *See United States v. Bush,* 5 Cir. 1978, 582 F.2d 1016;

*United States v. Britt,* 5 Cir. 1975, 508 F.2d 1052, *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42. *See also United States v. Cella,* 9 Cir. 1977, 568 F.2d 1266. Thus, no defendant can bolster his Fourth Amendment claim by a property interest. Each must rest upon his own justifiable expectations to establish a zone of privacy in the "Sky Top II" entitled to Fourth Amendment protection.

■ Ownership of the "Sky Top II" or direct invitation from its owner is not the exclusive way to establish a Fourth Amendment interest in privacy aboard the vessel. A defendant's attempts to maintain his privacy, *see United States v. Chadwick,* 1977, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538, 548; *Katz v. United States,* 1967, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 581, and his use of an area, *see Jones v. United States,* 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697; *United States v. Britt,* 5 Cir. 1975, 508 F.2d 1052, 1055, *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42, are both relevant considerations that may establish the existence of a privacy interest even absent property rights in the area. *See Rakas v. Illinois,* 1978, 439 U.S. 128, 150, 99 S.Ct. 421, 435, 58 L.Ed.2d 387, 405 (Powell, J., concurring).

■ Pursuing that line, those of the defendants who had keys to the vessel and who sometimes slept on it contend they have thus shown a privacy interest. They compare themselves with the defendant in *Jones v. United States,* 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, whose possession of a key to a friend's apartment, storage of personal possessions in the apartment and right to exclude others from the apartment was enough to make him a person aggrieved by an illegal search that took place while he was present at the apartment.

The Fourth Amendment protects the reasonable expectations of privacy of those in airplanes, *United States v. Ivey,* 5 Cir. 1977, 546 F.2d 139, *cert. denied,* 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263, in automobiles, *Delaware v. Prouse,* 1979, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660, and aboard ves-

sels. While we have not settled definitively the full scope of Fourth Amendment protection against entries on vessels by Coast Guard and customs officials, *see United States v. Whitmire,* 5 Cir. 1979, 595 F.2d 1303, *petition for cert. filed,* 48 U.S.L.W. 3262 (Sept. 5, 1979, No. 79–375); *United States v. Williams,* 5 Cir. 1979, 589 F.2d 210, rehearing en banc granted, 600 F.2d 18, we cannot ignore the obvious fact that the mobility of airplanes, automobiles and boats makes them at least factually different from real property. *Id. See United States v. Martinez-Fuerte,* 1976, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116; *United States v. Cadena,* 5 Cir. 1979 (on rehearing), 588 F.2d 100.

What is a reasonable expectation of privacy is by definition related to time, place and circumstance. While Felix B. Vicknair had given each of his sons permission to use the vessel, none of them was residing aboard it in November, and none testified that he had ever used it as a temporary or permanent residence. Access to the relatively small vessel, apparently on a come-as-you-wish basis, was shared with six other defendants, and with the wife, daughter and son of defendant Joseph Kersting, who also sometimes stayed on the vessel. No one used the vessel as a home or permanent living quarters, *cf. United States v. Williams,* 5 Cir. 1977, 544 F.2d 807. Considering the corporate ownership of the vessel; the latitude to use it given to so many people second-hand from the corporate president as to some, and third-hand from his sons as to others; the lack of separate space, quarters or lockers for anyone; and the apparently indiscriminate coming and going of so many people it could hardly be said that there was any expectation of privacy for anyone aboard the vessel.

At the time of the November search no defendant was aboard the vessel or in a position to exclude others from it. In fact, the police officers apparently encountered not even a locked door obstructing their access to the vessel. Except for the times when each defendant was personally aboard the vessel, no defendant knew exactly who

would be aboard or when. Moreover, the intermittent use of the vessel by the defendants does not indicate any intention by any of them to preserve some personal area of privacy upon the "Sky Top II." The least casual visitor to the vessel had stayed aboard overnight only a half-dozen times in the three months preceding the illegal search. He apparently left work clothes and tools aboard, but there is no indication that he attempted to secure them from intruders or that, during his stay on the vessel, he had exclusive dominion over it.

We decline to hold that these individuals who had no direct authority from the corporate owner to use its property and no reasonable expectation of real privacy from other individuals have somehow shown those efforts to maintain privacy and the protected use of an area necessary to give them an expectation reasonable in a constitutional sense. We, therefore, conclude that none of the defendants was personally aggrieved by the illegal search of the "Sky Top II." *See United States v. Byers,* 5 Cir. 1979, 600 F.2d 1130; *United States v. Reyes,* 5 Cir. 1979, 595 F.2d 275.

### C. *The Residence*

The claims of some of the defendants to a reasonable expectation of privacy in the residence are more substantial. However, no evidence was obtained by the illegal entry on these premises and the only lead obtained was the odor of marijuana. This alone, for reasons we set forth below, was not sufficient to taint the December events. Therefore we need not discuss the claims of privacy at the residence.

### IV.

■ In determining whether evidence is tainted by an illegal search, the proper inquiry is "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 1963, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455. Not every fruit that

grows from poisonous trees is constitutionally lethal. If the government can demonstrate either that the evidence sought to be suppressed was acquired through an independent source, *Silverthorne Lumber Co. v. United States,* 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; *United States v. Fredericks,* 5 Cir. 1978, 586 F.2d 470, 479 n. 13, *cert. denied,* 1979, 426 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776, or that the connection between an illegal search and evidence thereafter obtained has become "so attenuated as to dissipate the taint," *Nardone v. United States,* 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312, exclusion is not justified.

■ It is implicit in the holdings of the Supreme Court on the subject, *see United States v. Ceccolini,* 1978, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268; *Nardone v. United States,* 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; *Wong Sun v. United States,* 1963, 371 U.S. 471, 83 S.Ct. 407; 9 L.Ed.2d 441, that the commission of police illegality during the course of an investigation does not require the complete abandonment of the inquiry and a cessation of efforts to uncover criminal conduct. *See United States v. Cella,* 9 Cir. 1977, 568 F.2d 1266.

■ The district judge rejected the defendant-appellees' assertion that police surveillance was increased after the November entry, but he concluded that there was no "independent source" of the evidence at issue and that the December seizures would not have taken place had the November caper not occurred. His determination to exclude the evidence rested upon those factual conclusions. In light of our conclusion that the defendants may not challenge the search of the "Sky Top II," however, the decision to exclude the evidence seized in December was incorrect, for the only information obtained during the illegal November search, apart from that received on the boat, does not taint the December seizure.

Prior to the detection of the odor of marijuana emanating from the Balada Street residence, the police had ample reason to

suspect that the residence and boat were involved in a smuggler's plot. Their observations of the boat confirmed their suspicions of its role. The odor they detected as they passed by the home's air-conditioning vent may have produced self-assured smiles, but in light of the evidence already before them it could not have contributed to their decision to continue investigating the boat and residence. In fact, following the November entry police surveillance focused not on the residence itself, but on the "Sky Top II." The raid on December 14 was prompted by the police appraisal that the activities of the "Sky Top II" indicated that its interior likely was loaded with smuggled goods.[6] The odor of marijuana at best a *de minimis* piece of information in view of what the police had before them, provided neither impetus nor direction to the police investigation, *see United States v. Cales,* 9 Cir. 1974, 493 F.2d 1215; *United States v. Bacall,* 9 Cir. 1971, 443 F.2d 1050, cert. denied, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557, and serving at most to confirm suspicions that were already strongly supported by independent sources of evidence. *See United States v. Pike,* 5 Cir. 1975, 523 F.2d 734, cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830.

The evident facts are worth noting again: no evidence was obtained in the November entry; no leads were produced by the police walk around the house; the information acquired did not contribute to the shape of the investigative effort; the police did not utilize illegally obtained leads to trap a criminal and then contend that the existence of legally obtained leads that led in

the same direction purged the taint. *United States v. Castellana,* 5 Cir. 1974, 488 F.2d 65, *reversed on other grounds,* 500 F.2d 325 (en banc). The simple failure of the police to disengage a focused and continuing investigation following their illegal detection of a suspicion-confirming aroma cannot alone establish the taint necessary to warrant exclusion of the evidence in this case. The whiff of marijuana was not so Fourth-Amendment-noxious as to require the suppression of everything that followed.

We are satisfied that there is no evidence supporting the assertion that the December seizures were the result of police exploitation of their observations at the side of the Balada Street residence in November. We therefore conclude that the seized evidence was obtained from sources and by means independent of any invasion of defendants' Fourth Amendment rights and that the evidence obtained was admissible against them. We reach the same conclusion with respect to the alleged taint of what they thereafter said.

The judgment of the district court suppressing the evidence against the defendants is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.[7]

---

**6.** The intensification of police efforts that led to the December seizures began on December 13 when the police discovered that the "Sky Top II" was absent from its Balada Street mooring despite small craft warnings for the area and that a helicopter search had failed to locate the vessel in the coastal waters. Defendants-appellees concede that smugglers ply their trade primarily at night and in rough seas in order to

avoid detection. Therefore, the long absence of the "Sky Top II" on a stormy night was a significant indication to the police that smuggling might be in progress.

**7.** The trial court did not consider and we do not now express any view concerning whether the December search was itself valid in the absence of a warrant.