UNITED STATES of America

v.

G. Cecil HARTLEY, Travis Dell, Robert
L. (Pat) Paterson, Treasure Isle, Inc.

No. 79–69–Cr–T–GC.

United States District Court,
M. D. Florida,
Tampa Division.

April 3, 1980.

Breckinridge L. Willcox, U. S. Dept. of Justice, Washington, D. C., Lynn H. Cole, Asst. U. S. Atty., Tampa, Fla., for plaintiff U. S.

Arnold D. Levine, Tampa, Fla., for defendant Hartley.

James S. Byrd, Orlando, Fla., for defendant Dell.

Anthony Gonzalez and Bennie Lazzara, Jr., Tampa, Fla., for defendant Paterson.

James M. Russ, I. Paul Mandelkern, Orlando, Fla., for defendant Treasure Isle.

## ORDER

CARR, District Judge.

Presently before the Court are several Motions filed by the Defendants. Defendants Hartley, Paterson, and Treasure Isle, Inc. have filed Motions to Suppress, which have been adopted by Defendant Dell. Defendant Hartley has filed a Motion to Dismiss, to Suppress and In Limine to Limit

the Government's Proof at Trial, which is based on the alleged violation of 18 U.S.C. § 1385, the Posse Comitatus Act. Defendant Treasure Isle, Inc. has filed a similar Motion. These Motions have been adopted by all Defendants. An evidentiary hearing was held on the Motion to Suppress on January 18 and 21, 1980, after which the parties were allowed to file supplemental memoranda. After consideration of the evidence adduced at the hearing, the argument of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law in compliance with Rule 12(e), F.R.Cr.P.

## I. THE FACTS

Treasure Isle, Inc. is a Florida corporation which is engaged in the business of buying, processing, and selling shrimp and other seafood. Prior to the return of this Indictment, Treasure Isle had sold a substantial amount of its product to the United States Department of Defense. This included sale of frozen breaded shrimp, with which the Motions are concerned. Treasure Isle's contractual relationship with the United States Government included a provision that allowed Government personnel to be on the premises of the Treasure Isle plant in Dover, Florida, in order to inspect the product, and to insure that it complied with Government contract specifications. During the period of time which is pertinent to the defendants' Motions, the inspectors conducted what is known as an end-item inspection. Each day, after the shrimp had been processed and packed into boxes, each of which contained 4½ pounds of shrimp, the inspectors would randomly select a number of boxes, the number was usually 13, to be tested for compliance with contract specifications. The samples were placed inside a locked freezer which was located in a laboratory within the Treasure Isle plant. The laboratory was used exclusively by Government inspectors, who, at the time which is material to the Motions, were United States Air Force personnel. The laboratory was usually secured although Treasure Isle employees cleaned it two to three times a week after the inspectors had left for the day. The inspectors

would ask that the laboratory be cleaned if such was their desire.

The shrimp samples were tested on the day after they were selected. If the shrimp met Government specifications, the entire days production was approved for sale to the Government. The randomly selected shrimp which were not consumed during the testing process were returned to the production line for use in that day's production.

The shrimp was shipped from the Treasure Isle plant in sealed cartons each of which contained ten 4½ pound boxes. At destination the shrimp was subjected to a cursory inspection by other military personnel as to general condition and temperature. If the shrimp passed the destination inspection it was accepted and then became the property of the United States Government.

In late 1977, and early 1978, Sgt. Robert O'Brien was the Air Force non-commissioned officer in charge of inspection of all shrimp processed in the Tampa Bay area for sale to the military. His immediate superior was Chief Master Sgt. Billy Summerford, who was stationed at MacDill Air Force Base. Sgt. Summerford's immediate superior was Colonel William Mohri, who was chief of veterinary services at MacDill Air Force Base. Sgt. Danny Holt was an Air Force inspector assigned to the Treasure Isle plant, as was Airman David Klopp.

The Defense Investigative Services (DIS), the investigative arm of the Department of Defense, began an investigation of Treasure Isle and possible "irregularities" with regard to the inspection of Shrimp in August, 1976. The chief of veterinary services at MacDill AFB (the predecessor to Colonel Mohri) was advised of the investigation, which was terminated in December, 1976. At the direction of DIS headquarters, however, the investigation was reopened in the spring of 1977, and Colonel Mohri was so advised. Early on during this second investigation Sgt. O'Brien was interviewed by a DIS agent concerning his knowledge of irregularities and improprieties in connection with inspection activities. The investiga-

tion was primarily concerned with bribery and attempted bribery of Air Force inspectors.

In late 1977, Airman Klopp became suspicious concerning the security of the shrimp samples which he had selected for testing. After discussing these suspicions with Sgt. O'Brien (who in turn reported this to Colonel Mohri) it was decided that Airman Klopp would initial his sample boxes in the usual manner but that he would make special note of their location so that he could more definitely determine whether the samples were being tampered with after they had been selected and locked in the freezer. After so doing, on one occasion Airman Klopp determined that the samples which he had selected on the previous day had been replaced by other shrimp which he had not selected.

After discussions between and among Airman Klopp, Sgt. Holt, Sgt. O'Brien, Chief Summerford and Col. Mohri, it was decided that special marks should be placed on the shrimp samples so that it could be conclusively determined that the samples were being switched. This decision was made just before Christmas, 1977.

On January 3, 1978, lot no. F6968, consisting of frozen breaded shrimp, was processed at Treasure Isle for sale to the Department of Defense. Airman Klopp randomly selected 13 boxes of shrimp for testing. On each he placed a one-half inch grease pencil mark along the bottom lip of the box. This was not a mark that was normally used during the inspection procedure. The Air Force personnel who made the decision to use this special mark did not consult with any criminal investigator before so deciding, nor did they seek to obtain a search warrant or other judicial authorization.

On the morning of January 4, 1978, the 13 sample boxes were examined and it was determined that the samples from lot no. F6968 had been tampered with. This determination was based on the absence of the special mark which had been placed on the boxes by Airman Klopp. Airman Klopp repeated the use of the special marks on sample boxes of shrimp selected on January 4, 1978, which were part of lot no. F7008.

Again, it was determined that the samples had been switched.

On January 4, 1978, after the samples from lot no. F7008 had been marked, the inspectors at Treasure Isle, Sgt. O'Brien and Col. Mohri reported to the Quality Assurance Officer at the Defense Personnel Support Center (DPSC) in New Orleans, Louisiana, regarding the sample switching. Numerous phone calls were made between Tampa and New Orleans as result of which the Air Force inspectors were told to continue specially marking their randomly selected samples. On or about January 6, 1978, Sgt. O'Brien requested that a criminal investigator be assigned to take over the investigation. On January 9, 1978, Sgt. O'Brien met with Agent David Kirchgessner of DIS, and told him about the special marks which had been placed on the boxes and the switching of samples that had occurred. Sgt. O'Brien also informed Agent Kirchgessner that Pat Simmons, a former Treasure Isle employee, had told Sgt. Holt on January 4, 1978, that she had a key to the Air Force laboratory freezer at the Treasure Isle plant, and that sample boxes were being switched by Treasure Isle employees. On January 13, 1978, Agent Kirchgessner interviewed Ms. Simmons and learned that the boxes with the special markings had been placed back into master cartons for lots no. F6968 and F7008 and were shipped to various DPSC warehouses. Before these shipments reached their destination, however, DIS notified DPSC to be on the lookout for those specific lots. The purpose of this notification was so that the receiving officials could find the specially marked boxes and test them for compliance with specifications.

On January 18, 1978, a portion of lot F6968 arrived at the DPSC warehouse in Watertown, Massachusetts. Upon arrival agents of the DIS, along with military personnel, located the boxes with the special marks. Portions of this lot were later subjected to special testing, by both military and civilian personnel. Portions of lot F7008 were later recovered and tested at Norfolk, Virginia, and Fort Worth and San Antonio, Texas. Military personnel assisted

and participated in the testing of the shrimp at these locations also. The results of these tests are the subject of the Motions to Suppress.

The Indictment in this case was returned on August 8, 1979. It charges the Defendants with conspiracy, mail fraud, interstate transportation of property taken by fraud, and racketeering.

## II. THE MOTIONS TO SUPPRESS

Defendants Hartley, Paterson and Treasure Isle, Inc. have filed Motions to Suppress, all of which raise similar issues. The Motions assert that the special markings made on the sample boxes constituted a warrantless search within the meaning of the Fourth Amendment to the Constitution; that no exception to the warrant requirement was present; that the later recovery of the specially marked boxes was a seizure for purposes of the Fourth Amendment; and that all physical evidence, tests, testimonial evidence and other fruits of the illegal search and seizure should be suppressed.

The United States responds to the Motions by arguing that the inspectors' activities did not constitute a search, and that, assuming that it was a search, it was reasonable and did not infringe upon any legitimate interest protected by the Fourth Amendment. In addition, it is asserted that the Defendants consented to the search by allowing the inspectors on the premises to conduct inspections, and that Treasure Isle had, in effect, abandoned the shrimp at the time it was seized by Government agents.

## A. THE LAW

The Fourth Amendment to the Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . ."
In the case of *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) the Supreme Court wrote:

The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law-enforcement agents, in order "to safeguard the privacy and security of individuals against arbitrary invasion."

440 U.S. at 653–654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667, *quoting Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978).

In determining what conduct on the part of Government officials is "reasonable" the Court must focus on whether the conduct has infringed upon an interest which is protected by the Fourth Amendment. Only if such an interest is implicated by Governmental action does the Fourth Amendment apply. This, in turn, depends on whether the person invoking the protection of the Fourth Amendment can establish a justifiable or legitimate expectation of privacy which has been invaded. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). As the Supreme Court has recently distilled the inquiry, *see Smith v. Maryland*, 442 U.S. 735, 739–741, 99 S.Ct. 2577, 2579–2580, 61 L.Ed.2d 220, 226–227 (1979), two questions are involved: First, has the individual, by his conduct, "exhibited an actual (subjective) expectation of privacy?" *Katz v. United States, supra*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Put another way, the Court must ask whether the individual has shown by his conduct that he seeks to preserve something as private. *Id.* at 351, 88 S.Ct. at 511. Second, the Court must determine whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable'." *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). To answer this second question, the Court must look to all of the circumstances surrounding the intrusion complained of.

In *Rakas v. Illinois, supra*, the Supreme Court cited the subjective expectation of privacy possessed by the "burglar plying his trade in a summer cabin during the off season." His presence is wrongful, the Court said, and accordingly his expectation of privacy is not one that society is prepar-

ed to recognize as reasonable. *Id.* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12. In order to be legitimate, an expectation of privacy "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* The Court noted, however, that "even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon." *Id.*

█ A number of factors have been considered by the Supreme Court in determining the reasonableness of asserted expectations of privacy.[1] In addition to property interests, the Court has looked to whether an individual "took normal precautions to maintain his privacy; to the way the individual has used a certain location; and to history, in order to determine whether certain Governmental intrusions were perceived to be objectionable by the framers of the Fourth Amendment. *See Rakas v. Illinois, supra* at 152–153, 99 S.Ct. at 435 (Powell, J., concurring). The Court has found that a person has no legitimate expectation of privacy in information which is voluntarily turned over to third parties, *e. g., United States v. Miller,* 425 U.S. 435, 442–444, 96 S.Ct. 1619, 1623–1624, 48 L.Ed.2d 71 (1976), or in information with respect to which a person has assumed the risk of disclosure. *Smith v. Maryland, supra* 442 U.S. at 743, 99 S.Ct. at 2582, 61 L.Ed.2d at 229. A history of pervasive Governmental regulation in an industry may also negate any

reasonable expectation of privacy which "could exist for a proprietor over the stock of such an enterprise." *Marshall v. Barlow's, Inc., supra* 436 U.S. at 313, 98 S.Ct. at 1821 (dictum); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970);[2] *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).[3]

█ The Supreme Court has made it clear that the prohibitions of the Fourth Amendment apply during civil as well as criminal investigations, and protect commercial premises as well as homes. *Marshall v. Barlow's, Inc., supra,* 436 U.S. at 312, 98 S.Ct. at 1820; *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 328, 99 S.Ct. 2319, 2325, 60 L.Ed.2d 920, 930 (1979). However, the Fourth Amendment protects the legitimate expectations of privacy of persons not places, *Ybarra v. Illinois,* —— U.S. ——, ——, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979), and it is clear that to successfully challenge the admissibility of evidence obtained unconstitutionally, a Defendant must establish that *his own* Fourth Amendment rights were violated by the conduct upon which he wishes to base exclusion. *See Rakas v. Illinois, supra,* 439 U.S. at 133–134, 99 S.Ct. at 424–425; *United States v. Reyes,* 595 F.2d 275, 278 (5th Cir. 1979). Fourth Amendment rights may not be vicariously asserted. *Id.* Accordingly the position of each Defendant seeking to apply the exclusionary rule must be examined separately. Where, as in this case, a corporate Defendant is involved, an individual Defendant cannot assert the corporation's

1. The Fifth Circuit has recently said, "what is a reasonable expectation of privacy is by definition related to time, place and circumstance." *United States v. Vicknair,* 610 F.2d 372, 380 (5th Cir. 1980).

2. In *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), the Supreme Court held that Congress could authorize warrantless inspections of liquor dealers, because the liquor industry had long been subject to close supervision and inspection.

3. In *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), the Court

upheld warrantless inspections of dealers in firearms under the Gun Control Act of 1968. The Court found that inspection was of crucial importance to the regulatory scheme since it assured that weapons were distributed through regular channels, helped to prevent sales to undesirable customers, and aided in the prevention of violent crime. Particular emphasis was placed on the fact that only a limited threat was placed on the dealers legitimate expectations of privacy, because the dealer had chosen to engage in a "pervasively regulated business and to accept a federal license." 406 U.S. at 316, 92 S.Ct. at 1596.

Fourth Amendment rights. When corporate property is searched or seized, even a stockholder of the corporation must establish an independent privacy interest in the area searched or the goods seized before he may prevail on Fourth Amendment grounds. *See United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir. 1980).

## B. APPLICATION OF THE LAW TO THE FACTS OF THIS CASE

■ With the foregoing principles in mind the Court will now examine the claims of the parties before the Court. The United States argues initially that there was no search in this case. The Defendants claim that the special markings placed on the boxes of shrimp constituted a search, thus triggering the warrant requirement of the Fourth Amendment. The question of whether there was in fact a "search" for purposes of the Fourth Amendment is a question which can only be answered through the application of substantive Fourth Amendment law. For constitutional purposes a search may be defined as a visual examination or use of some other means of gathering evidence, which infringes upon a person's reasonable expectation of privacy. *See Smith v. Maryland, supra.*[4]

The Air Force inspectors at the Treasure Isle plant *were* attempting to gather evidence through the use of the special marks which were placed on the boxes of shrimp which had been pulled for testing. They were seeking evidence of tampering with the samples.[5] The marks were placed on the boxes so that the inspectors could, at a later time determine the location of the boxes. In order for the Defendants' argument to prevail, the Court must find that they each possessed a legitimate expectation of privacy with regard to the location of the sample boxes, and their activities in connection with the boxes.[6]

■ The Court concludes initially that the individual Defendants do not possess such a legitimate expectation of privacy since they had no property interest in the goods or areas allegedly searched.[7] The fact that they may have been present on the premises with the permission of the corporation is of no help to their claim. *See United States v. Vicknair, supra.* None of the other recognized prerequisites for the establishment of a reasonable expectation of privacy are present here. *See Rakas v. Illinois, supra.* The argument of the corporate Defendant, however, requires a separate analysis.

4. The Supreme Court, in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), was faced with the question of whether the use of a pen register (a mechanical device that records the numbers dialed on a telephone) constituted a "search" within the meaning of the Fourth Amendment. The Court stated, "Given a pen register's limited capabilities, . . . petitioner's argument that its installation and use constituted a search necessarily rests upon a claim that he had a legitimate expectation of privacy regarding the numbers he dialed on his phone." *Id.,* 442 U.S. at 742, 99 S.Ct. at 2581, 61 L.Ed.2d at 227. After analyzing the facts, the Court concluded that even if the petitioner had an actual expectation of privacy, such an expectation was not legitimate. "The installation and use of a pen register, consequently, was not a 'search', and no warrant was required." *Id.,* 442 U.S. at 745, 99 S.Ct. at 2583, 61 L.Ed.2d at 230.

5. The Court need not decide whether the special marks were pursuant to a "criminal investigation" as the defendants argue. For pur-

poses of Fourth Amendment analysis, whether the investigation was criminal or civil makes no difference.

6. The question is not whether "Treasure Isle's legitimate expectation of privacy extended throughout its manufacturing plant and cold storage facility," *Defendant Treasure Isle's Supplemental Memorandum of Law In Support of Motion to Suppress* at p. 7, although in a different factual context this might be an accurate statement of the pertinent inquiry. *See Northside Realty Associates, Inc. v. United States,* 605 F.2d 1348, 1355 n.20 (5th Cir. 1979).

7. Before *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Court would have determined whether each Defendant had "standing" to challenge the search. After *Rakas* the Court must focus on each Defendant's substantive Fourth Amendment rights. *See United States v. Sanders,* 592 F.2d 788, 791–792 (5th Cir.), *cert. granted,* 444 U.S. 914, 100 S.Ct. 227, 62 L.Ed.2d 168 (1979).

█ A corporation may possess a legitimate expectation of privacy through its employees [8] or as a separate entity. While the employees of Treasure Isle undoubtedly hoped that their activities would go unnoticed, their expectation of privacy was not one which can be called reasonable. Several circumstances support this conclusion. Treasure Isle had done business with the United States Government for many years. As a part of this relationship Government inspectors were allowed in areas of the Treasure Isle plant which were closed to the general public. The duties and responsibilities of the Government inspectors were well known to Treasure Isle employees. An important part of the inspection process was security of the boxes of shrimp chosen for inspection and testing. The Treasure Isle employees were well aware of this fact. The samples of shrimp were kept under lock and key in a freezer which was in a laboratory which was also usually locked. Anyone tampering with the sample boxes under such conditions could not justifiably believe that their activities would escape the scrutiny of those charged with insuring that such activities did not occur. Whether employees of Treasure Isle did or did not have the right to switch samples, it can be said, at best that the expectation of privacy they subjectively possessed regarding their activities is not one that society is prepared to recognize as reasonable.

█ While there is no doubt that a corporation, as an entity, has rights under the Fourth Amendment, the question of whether and when the corporation may possess a legitimate expectation of privacy presents considerations not present in the inquiry as it relates to individuals. The Supreme Court has held as follows with regard to the privacy rights of corporations:

> [C]orporations can claim no equality with individuals in the enjoyment of a right to privacy. They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation.

*United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368–369, 94 L.Ed. 401 (1950), *quoted with approval in California Bankers Association v. Shultz*, 416 U.S. 21, 65–66, 94 S.Ct. 1494, 1519, 39 L.Ed.2d 812 (1974). *See also, United States v. Biswell, supra,* 406 U.S. at 316, 92 S.Ct. at 1596 (the justifiable expectation of privacy of an individual involved in a pervasively regulated industry is diminished). *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Friedman, *Some Reflections on the Corporation as Criminal Defendant,* 55 Notre Dame Law. 173, 192–195 (1979).

The history of regulation which exists in this case [9] is such that a corporate expectation of privacy cannot be justified as to the items and conduct which are assertedly protected by the Fourth Amendment. Thus, as to the corporate Defendant, there was no search, for constitutional purposes. The Motions to Suppress are DENIED.

## III. THE POSSE COMITATUS ACT MOTIONS

Defendants Hartley and Treasure Isle, Inc. assert that the Indictment should be dismissed or that certain evidence should be suppressed based on violations of the Posse Comitatus Act, 18 U.S.C. § 1385.[10]

8. For example, if the Government had conducted an unauthorized search of the office of a corporate employee and had seized corporate documents, the corporation itself could perhaps establish a legitimate expectation of privacy with regard to the area searched and papers seized based on the conduct and expectations of the employee.

9. The regulation referred to is government inspection of products sold to the Department of Defense to insure that the products conform to contract specifications. For purposes of this case other forms of Government regulation, such as Department of Commerce inspection of shrimp for use in non-military contracts or OSHA inspections, are not being considered as the "pervasive regulation" of the *Biswell* case.

10. The Posse Comitatus Act provides, "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of Army or Air Force as a posse comitatus or otherwise to

The Posse Comitatus Act became law in 1878, and was originally enacted as a response to the use of military personnel to enforce the law in the South during reconstruction.[11] No reported decision which construes the Act has been rendered within this Circuit. However, in *United States v. Wolffs*, 594 F.2d 77 (5th Cir. 1979), the Court was faced with an allegation of a violation of the Act. It stated as follows:

> We pretermit discussion of whether there was a violation of [the Posse Comitatus Act]. We need not decide that complex and difficult issue because, assuming without deciding that there was a violation, application of an exclusionary rule is not warranted. If this Court should be confronted in the future with widespread and repeated violations of the Posse Comitatus Act an exclusionary rule can be fashioned at that time.

*Id.* at 85 (footnote omitted). Thus, assuming that this Court did find a violation of the Posse Comitatus Act here, the exclusion of evidence which was a product of the violation would be inappropriate. The Court reads *Wolffs* to mean that an exclusionary rule shall not apply to violations of the Act unless the Fifth Circuit fashions one at a later time.

Although the Court in *Wolffs* did not decide the issue of whether there was a violation of the Posse Comitatus Act in that case, it did advert to the case of *United*

States v. McArthur, 419 F.Supp. 186 (D.N. D.), aff'd sub nom. *United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977), and the various tests set forth therein for determining whether the act has been violated. *United States v. Wolffs, supra* at 85 n.8. Three different legal standards were described in *McArthur*. The first was whether there was a "direct active use" of military personnel by civilian law enforcement agents to execute the laws.[12] The second test asked whether a "use of any part of the Army or Air Force *pervaded* the activities" of the civilian law enforcement agents.[13] The third standard, which was applied by the Court in *McArthur*, can be paraphrased as follows: Were Army or Air Force personnel used by civilian law enforcement officers in such a manner that the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature.

This Court need not decide which test should be employed here. Any of the three, if applied in this case would compel the conclusion that the Posse Comitatus Act has not been violated. Agent Kirchgessner of the DIS is a civilian employee of the Department of Defense. The Defendants allege that he was aided in his investigation of potential illegal activities at Treasure Isle by military personnel in violation of the Act. The military assistance was in the form of the handling and testing of shrimp[14] after it had been shipped to

---

execute the laws shall be fined not more than $10,000 or imprisoned not more than two years or both." 18 U.S.C. § 1385. Posse Comitatus has been defined as follows: "The power or force of the county. The entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc." Black's Law Dictionary, 1046 (5th ed. 1979); *United States v. Wolffs*, 594 F.2d 77, 84 n.7 (5th Cir. 1979).

11. Legislative history indicates that the immediate objective of the legislation was to put an end to the use of federal troops to police state elections in the ex-Confederate states where the civil power had been reestablished. *See Chandler v. United States*, 171 F.2d 921, 936 (1st Cir. 1948), *cert. denied*, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949). Several other cases have set forth the legislative history of

the Act. *See e. g.*, *United States v. Red Feather*, 392 F.Supp. 916, 921–923 (D.S.D.1975), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976); *Wrynn v. United States*, 200 F.Supp. 457, 463–465 (E.D.N.Y.1961). *See generally*, Note, *The Posse Comitatus Act: Reconstruction Era Politics Reconsidered*, 13 Am. Crim.L.Rev. 703 (1976).

12. This test was fashioned by Judge Bogue in *United States v. Red Feather, supra* note 11.

13. This test was devised by Judge Urbom in *United States v. Jaramillo*, 380 F.Supp. 1375 (D.Neb.1974), *appeal dismissed*, 510 F.2d 808 (8th Cir. 1975).

14. The Defendants have not expressly argued that the special markings placed on sample boxes of shrimp by the Air Force inspectors

government warehouses at various locations. These activities were undertaken at the direction of DIS.

The activities of military personnel in this case did not constitute direct active involvement in the execution of the laws, nor did the use of military personnel pervade the activities of the civilian authorities. This was a civilian investigation originating from within the Department of Defense. The investigation was of improprieties in connection with inspection and sale of shrimp pursuant to contracts with the Department of Defense, and military personnel were normally used for various purposes in the execution of those contracts. The investigation, by its very nature involved military personnel who were acting at the direction of DIS, but were performing functions they would normally perform in the course of their duties regarding the inspection and testing of shrimp which was to be used by the military.

■ The Court is cognizant of the potential danger of military permeation of civilian law enforcement. The Posse Comitatus Act exists to guard against that danger. For the reasons stated above, however, the Court concludes that the facts in this case do not constitute a violation of the Act. The Defendants' Motions are DENIED.[15]

also constituted execution of the laws by military personnel. The Court finds, however, that this activity was undertaken on the initiative of the Air Force inspectors and was within the scope of their normal duties. The later revelation of their findings to the DIS was not in violation of the Posse Comitatus Act.

15. Defendant Treasure Isle also alleges a violation of 28 U.S.C. § 535(b), which calls for the expeditious reporting to the Attorney General of potential criminal violations by Government officers and employees. The statute, however, does not limit "the authority of the military departments to investigate persons or offenses over which the armed forces have jurisdiction." 28 U.S.C. § 535(c)(1). The Government correctly points out that the acceptance of bribes by military inspectors is an offense over which the armed forces have jurisdiction. Thus there was no duty under 28 U.S.C. § 535 to report the potential criminal violations of the Air Force inspectors to the Attorney General.