**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Juan Maria REYES, Jesus Diaz, Hernando Gutierrez-Andrade and Mario Luis Perez-Jaramillo, Defendants-Appellants.**

**No. 78–5426.**

United States Court of Appeals,
Fifth Circuit.

May 18, 1979.

---

Michael L. Bryant, Gainesville, Fla., for defendants-appellants.

John L. Briggs, U. S. Atty., Anthony LaSpada, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKELTON *, Senior Judge, and RUBIN, Circuit Judge.

ALVIN B. RUBIN, Circuit Judge:

The four defendants, illegal aliens from Colombia, were convicted of conspiracy to import and importation of marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 963. They now claim there was insufficient evidence of their guilt to justify the jury's verdict, and that the trial judge erred in refusing to exclude evidence secured by an exhaustive search of the aircraft on which they arrived in this country. Although we conclude that the defendants do not have standing to contest the search of the plane, we agree that no reasonable jury could have concluded that the government proved their guilt beyond a reasonable doubt. We therefore reverse their convictions.

Early on the morning of January 18, 1978, the air traffic controller at Tampa International Airport picked up a signal from a transponder on a Lockheed Lodestar aircraft entering American airspace in the southwest quadrant, approximately 45 miles off the coast of Florida. The signal emitted indicated to the authorities that the plane was "suspect." The aircraft did not respond to efforts at radio communication, and was tracked on an erratic course around the Tampa Bay-St. Petersburg area for almost three hours; a customs plane was then launched to intercept it. Customs agents followed the suspect aircraft as it landed at the St. Petersburg-Clearwater Airport and taxied off the runway to a grassy area away from the tower. They approached the plane and ordered the five occupants to get out.

The customs officers patted down the defendants and the pilot of the aircraft, William Campbell,[1] and asked them for identification. Campbell produced a pilot's license and other papers; the defendants, who said they spoke only Spanish, wrote their names. One agent asked his superiors to check the registration of the plane, and discovered that the number on the tail had been altered. Another agent opened the door of the aircraft and found that the interior had been smeared with chunks of fresh pineapple, masking the odor of any other prior cargo. A thorough search of

---

* Senior Judge, United States Court of Claims, sitting by designation.

1. Campbell was a co-defendant at trial and originally joined in this appeal. He was released on bond and has since failed to appear as directed by the district court and a bench warrant has been issued for his arrest. His appeal was therefore dismissed on March 12, 1979.

the plane revealed aviation charts, a Colombian newspaper, survival equipment and pieces of rope; when the plane's floor was vacuumed, minute amounts of marijuana debris were found.

Later that same day, Coast Guard officials recovered bales of marijuana floating in the Gulf of Mexico in locations under the recorded flight path of the aircraft, and wrapped in burlap bags with rope similar to that found in the plane. Defendants, who had been arrested as illegal aliens, were then charged with the crimes of which they were convicted.

The transponder, by which the aircraft was detected and tracked during its tortuous voyage around the Florida coast, had been installed fourteen months earlier by government agents pursuant to a search warrant issued by a federal court in Oklahoma. The aircraft was later seized by Colombian authorities, and United States officials had unsuccessfully endeavored to remove the transponder while the plane was in the custody of the Colombian government.

### I. Standing to Contest the Search

The defendants challenge the legality both of the monitoring of the aircraft by means of the government transponder and the physical search of the plane after its landing at the St. Petersburg airport. They contend that reception of the transponder signal fourteen months after the device was installed in the aircraft constituted a "continuing search" under *United States v. Holmes*, 5 Cir. 1975, 521 F.2d 859, *aff'd by an evenly divided court*, 5 Cir. en banc 1976, 537 F.2d 227. The initial installation of the transponder was based, they continue, on an overly broad and therefore invalid warrant, and, even if the warrant were valid, continued monitoring based on information then fourteen months old was unauthorized. The subsequent search of the aircraft was a direct result of this allegedly illegal surveillance and they therefore seek exclusion of the evidence discovered. The physical search was not independently justified, they claim, either as a border search, or as an

intrusion based on probable cause plus exigent circumstances.

We need not reach any of these issues because we conclude that the defendants have no standing to object to any search of the plane, either by electronic surveillance or by physical inspection, under either of the bases asserted.

### A. Legitimate Possessory Interest

Defendants first claim protection by virtue of their proprietary interest and legitimate presence in the aircraft under *Rakas v. Illinois*, 1978, —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387, *Brown v. United States*, 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208, and *Jones v. United States*, 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697. As the Supreme Court emphasized in *Rakas*, Fourth Amendment rights are personal and cannot be vicariously asserted. *Alderman v. United States*, 1969, 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176, 187. While a person may have a legitimate expectation of privacy in a place or object he does not own, protectible under the Fourth Amendment, the proponent of a motion to suppress must bear the burden of demonstrating to the satisfaction of the court that his own Fourth Amendment rights were violated by the challenged search or seizure. *Rakas, supra*, —— U.S. at —— n.1, 99 S.Ct. at 424, 58 L.Ed.2d at 393.

This the defendants failed to do. Indeed, they did not even prove to the trial court that they were "legitimately on the premises" within the meaning of *Jones*. The only testimony on behalf of the defendants in this regard was by one of the defendants, Jesus Diaz, who stated that the aircraft was sold to a Mr. Sanome at the Santa Marta Airport in Colombia, and that Mr. Sanome gave the defendants permission to use the plane. The government produced a witness, James Joyce, whose name was on the aircraft bill of sale and registration application. Although Joyce refused to answer questions about the present ownership of the plane, he admitted that he had instituted proceedings in federal court in Janu-

ary, 1978 to recover the plane as "the owner." Mr. Sandoval, another government witness, gave hearsay testimony concerning claims of ownership by unidentified individuals on behalf of the Colombian government. Giving due regard to the trial court's assessment of credibility, we cannot conclude that it was in error in discrediting the self-interested testimony of Mr. Diaz and holding that the defendants had failed to establish a legitimate possessory interest in the aircraft. As the Court stated in *Jones* and reiterated in *Rakas*, one wrongfully on the premises cannot move to suppress evidence obtained as a result of searching them. *Jones, supra*, 362 U.S. at 267, 80 S.Ct. at 734, 4 L.Ed.2d at 705; *Rakas, supra*, —— U.S. at —— & n.9, 99 S.Ct. at 429, 58 L.Ed.2d at 399.

■ Even had the trial court concluded that the defendants had demonstrated the legitimacy of their presence on the plane, this would have been insufficient per se to establish that their own Fourth Amendment rights were violated by any search of the aircraft. The Court in *Rakas* called the phrase "legitimately on premises" "too broad a gauge for measurement of Fourth Amendment rights," *Rakas, supra*, —— U.S. at ——, 99 S.Ct. at 429, 58 L.Ed.2d at 400, and directed our attention to the legitimate expectation of privacy of a defendant under the circumstances of a particular case. Here the defendants claimed to be mere passengers on the plane, illegal aliens being taken by Campbell to the United States. They made no assertion of ownership with regard to the cargo or the assorted discoveries of the Customs officers. Moreover, as noted with respect to automobiles in *Rakas*, one's expectation of privacy in an airplane is significantly less than that traditional expectation of privacy in one's home.

We conclude, therefore, that the defendants lack standing to object to a search of the aircraft, by electronic monitoring or physical intrusion, by virtue of either their presence on the plane or their privacy interest in it.

### B. Automatic Standing

The defendants next contend that possession of the seized evidence is an essential element of the crimes of which they were convicted—importation of marijuana and conspiracy to import—and that the government is therefore precluded from denying that the defendants have the requisite possessory interest in the evidence to challenge its admissibility.

■ The doctrine of "automatic standing" is an exception to the general precept that Fourth Amendment rights cannot be asserted vicariously, recognized by the Supreme Court in *Jones v. United States, supra*.[2] It is designed to fight the " 'vice of prosecutorial self-contradiction,' " *United States v. Oates*, 2 Cir. 1977, 560 F.2d 45, 53, by preventing the government from adopting the antithetical positions of charging possession as an element of a crime while denying that there was sufficient possession to entitle the accused to challenge the legality of the search by which the evidence was secured.

■ Although this circuit has followed the automatic standing rule established in *Jones, see United States v. Holmes, supra*, 521 F.2d at 868, importation is not a possessory offense invoking the automatic standing rule, and this circuit has never held possession to be an element of that crime.[3]

**2.** The Supreme Court noted in *Rakas* that it has not yet considered the continuing viability of the automatic standing rule in light of its later decision in *Simmons v. United States*, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. *Rakas, supra*, —— U.S. at —— n.4, 99 S.Ct. at 426, 58 L.Ed.2d at 395. *See also Brown v. United States*, 1973, 411 U.S. 223, 228–29, 93 S.Ct. 1565, 1568–69, 36 L.Ed.2d 208, 213.

**3.** *Ortiz v. United States*, 5 Cir. 1964, 329 F.2d 381, *cert. denied*, 379 U.S. 849, 85 S.Ct. 92, 13

L.Ed.2d 53, cited by defendants, involved a conviction for smuggling under 21 U.S.C. § 176a, predecessor to current 21 U.S.C. § 960(a). While the court did there indicate that "A basic element of the offense of smuggling marihuana, indeed the *sine qua non* of it, was possession in appellant," 329 F.2d at 382, it was discussing the propriety of the jury charge on "possession," a term used in § 176a to create a presumption of sufficient evidence for conviction, rather than appellant's standing. There is no

Indeed, the Ninth Circuit squarely rejected the same contention in *United States v. Valencia*, 9 Cir. 1974, 492 F.2d 1071, 1074, a decision cited with approval in *United States v. Gramlich*, 5 Cir. 1977, 551 F.2d 1359, 1363, *cert. denied*, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141, to explain the defendants' decision in that later case to abandon any claim of automatic standing when charged with conspiracy to import and importation.

While, as pointed out by the defendants, both *Valencia* and *Gramlich* do involve searches of a co-defendant's person or premises, and therefore could be explained as a rejection of any theory of constructive possession, the defendants have failed to cite a single instance in which any court has found automatic standing to challenge evidence used to convict a defendant of importation or conspiracy to import. We implicitly rejected such a notion in *United States v. Sullivan*, 5 Cir. 1973, 488 F.2d 138 (per curiam), where we found that defendants convicted of conspiring to import had no standing to object to a search of a van in which the drugs were found because they neither owned nor possessed either drugs or van at the time. If possession were an essential element of the crime, the court could not have reached this conclusion.

■ The defendants have failed to demonstrate any violation of their Fourth Amendment rights, or entitlement to "automatic standing" under *Jones*. The trial court properly denied their motion to exclude the evidence found during the search of the aircraft.

## II. Sufficiency of the Evidence

■ The only evidence adduced at trial against the four defendants was their presence on the aircraft when it landed at St. Petersburg-Clearwater Airport. This was insufficient to show beyond a reasonable doubt their participation in a conspiracy to import marijuana, or guilt of the substantive crime accomplished by their co-defendant, Campbell.

During oral argument, the government suggested that one or more of the defendants must have pushed the marijuana bales out of the low-flying aircraft into the Gulf and then smeared the interior of the plane with pineapple because Campbell could not have accomplished these tasks while flying the plane. The record does not disclose whether the plane had an automatic pilot and whether Campbell could have performed these chores unassisted. Even if we assume the correctness of the government's premises, however, there was no direct testimony that any particular defendant either ejected or helped to eject the bales or did anything to mask the odor of the erstwhile cargo. No other active role in the alleged conspiracy or in the charged importation was even intimated during the government's case.

The evidence of guilt was less than in *United States v. Cadena*, 5 Cir. 1978, 585 F.2d 1252, in which we affirmed the convictions of members of the crew of a vessel engaged in marijuana smuggling. There we noted that the crew sailed the heavily laden vessel for 45 days to a rendezvous point without apparent compulsion. The crew's active assistance was essential in the ship's navigation. There was direct testimony that, at the vessel's destination, 200 miles off United States shores, members of the crew transferred 150 bales of marijuana from their freighter to an American vessel, leaving much more of the contraband cargo still aboard. Importation of the bales of marijuana, the vessel's sole cargo, into the United States was the only apparent purpose for the voyage, and none other was later suggested. While specific evidence against any individual member of the crew was circumstantial, we concluded that the facts allowed us to affirm their convictions.

■ Here the government failed even to supply the minimal quantum of evidence held sufficient in *Cadena*. Unlike the

---

such statutory language in § 960(a); if the dictum in *Ortiz* does indicate that possession

was essential to a conviction under § 176a, it is not dispositive here.

freighter, the Lodestar airplane could be, and was, apparently, piloted by a single individual, Campbell. The defendants may have assisted in the flight, but they may as plausibly have been mere passengers during the short trip from Colombia to Florida. The government would like us to hold that the jury might have inferred that one or more of the defendants pushed bales of marijuana out of the plane and smeared the cabin with pineapple, but there was no direct testimony that *any* of them did so, much less that *all* of them participated. Each of the defendants was entitled to have his guilt or innocence determined as an individual; the government failed to prove beyond a reasonable doubt that each defendant or any particular defendant participated in any way in the importation scheme beyond being present in the aircraft. Finally, even though the defendants had no baggage, there was an alternative possible purpose for their presence on the plane: their attempt to enter this country illegally; certainly there is nothing to demonstrate that the efforts of all four were required for the success of for any illicit drug importation mission. Nothing the government presented at trial was inconsistent with the premise that one or more of the defendants went along for the ride, and that those who did so were anxious enough to obtain surreptitious entry to the United States to be less than particular about the cargo sharing their aircraft. The quantum of evidence in *Cadena* was as little as we are willing to accept as proof sufficient to infer guilt beyond reasonable doubt; the government here failed to meet even its generous requirements. Guilt cannot be established merely by demonstrating association.

Accordingly, the convictions of the defendants are REVERSED.