**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Luis SANCHEZ, Defendant–Appellant.**

**No. 79–5596.**

United States Court of Appeals,
Fifth Circuit.
Unit B

Jan. 22, 1981.

Rehearing and Rehearing En Banc
Denied March 6, 1981.

Mark King Leban, Miami, Fla., for defendant–appellant.

Gary J. Takacs, Asst. U. S. Atty., Tampa, Fla., for plaintiff–appellee.

Before MORGAN, ANDERSON and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge.

Luis Sanchez was rescued, along with co–defendants Angel and Suarez, from the fishing vessel *Letty* as she was sinking in the waters of the Gulf of Mexico approximately 115 miles off the coast of Sanibel Island, Florida. Although the *Letty's* crew escaped with their lives, they did not escape detection of their plans, for the Coast Guard, interested in the abandoned vessel, arrived in time to save the sinking vessel, along with her 32,000–pound cargo of marijuana.

Sanchez was tried, along with the two others, under an indictment charging all three with conspiracy to import into this country and to possess with intent to distribute a controlled substance. At the close of the Government's case the trial court granted the motions for acquittal of co–defendants Angel and Suarez on grounds suggested by this court's decision in *United States v. Reyes*, 595 F.2d 275 (5 Cir. 1979). While the evidence indicated that they were the crew of the *Letty*, the Government failed to prove anything more than that they might have known of the existence of a conspiracy to import, and therefore failed to support the further inference that they were willing participants in a conspiracy. On the strength of evidence suggesting that Sanchez was the skipper of the *Letty*, however, the trial court let the case against him go to the jury. The jury agreed with the Government that the evidence against Sanchez proved beyond a reasonable doubt that he was a willing participant in the conspiracy charged. On appeal Sanchez challenges the sufficiency of the evidence to support that conclusion.

At trial the facts developed as follows: The *Letty*, a 48.1–foot fishing vessel, had aroused the suspicions of local law enforcement officers in Punta Gorda, Florida, sometime prior to 10 January 1979,[1] on which day she was seen leaving port riding

1. The "suspicious" character of the *Letty* at that time consisted of her presence, along with another fishing vessel, the *Maria Lydia*, at a construction site dock; the extensive prepara-

tions for a sailing expedition aboard both vessels; and the presence of lobster traps on board the *Letty*, even though there was no appreciable lobster fishing within 140 miles of Punta

clear of her waterline. Later testimony indicated that she could not, at that time, have been bearing any considerable cargo. The *Letty* was not seen nor heard from until January 17.

On the morning of the 17th the British Merchant Marine vessel *Post Champion* was en route to Mobile, Alabama. According to the testimony of Captain David Williams, the ship's commanding officer, about 9:30 a. m. local time the *Post Champion* detected distress signals from a fishing vessel that was dead in the water. Responding to the call, the *Post Champion* arrived alongside the *Letty* about an hour later. It was apparent that she had been taking on water. A boarding party under the command of First Officer John Frewer went aboard to assess the damage. Officer Frewer testified that he spent no more than 15–20 minutes on board.[2] During that time he inspected the engine hold through a hatch in the cabin. The view was of the engine and no more than two or three feet aft. From his vantage point Frewer could see that the engine compartment had three to four feet of water standing inside, with two to three feet clear to the floorboards above. The boat's electrical system was flooded, thus preventing the use of her pumps and radio equipment. He did not see any bales in the space rear of the engine visible to him, nor did he inspect any of the *Letty's* other holds or lift any other hatch-covers on board. Finally, Frewer recollected a "musty" odor about the engine compartment which he did not consider unusual under the circumstances.

Meanwhile, the *Post Champion* had contacted the Coast Guard station in Key West. (The contents of all radio communications with the Coast Guard were admitted into evidence without objection under the "records of regularly conducted activity" exception to the hearsay rule, F.R.E. 803(6).) The *Post Champion* gave the names of the *Letty's* crew, defendants San-

chez, Suarez, and Angel, identifying Sanchez as the "operator." During his deposition Captain Williams also identified Sanchez as the *Letty's* skipper. The *Post Champion* related that the crew of the *Letty* had said that they had been adrift for five days and had been without food for two. They also said that they were delivering the boat from Tampa to Key West for the owner. After taking the crew of the *Letty* on board, communications between the *Post Champion* and Key West turned to the fate of the now–abandoned vessel. It was agreed that she be sunk, but on this point the evidence conflicted. Captain Williams and Officer Frewer recalled that the Coast Guard had instructed them to sink the *Letty* as a hazard to navigation. The radio communications between the *Post Champion* and Key West themselves, however, indicated that it was the idea of the *Letty's* crew to sink her, and that the Coast Guard replied that they couldn't prevent them from doing so if that was the "owner's" wish. In any event, Sanchez went back on board the *Letty* for the purpose of opening a seavalve in order to scuttle her. Again, the evidence conflicted slightly: It was Captain Williams who said that Sanchez, whom he identified as the *Letty's* skipper, went back on board the *Letty* to open the valve after he had come on board the *Post Champion*. Officer Frewer, on the other hand, who didn't recall the name of the skipper, testified that while he was still on board the *Letty* her skipper (whom he apparently could identify as such at the time) "said that there was a valve he could open which would let water in, and the last thing he did before leaving the boat was to open that valve. I didn't actually see him do it, but he disappeared aft somewhere to do it." After advising Key West of the expense of further delay, the *Post Champion* was given permission to leave. The time was approximately 2:00 p. m., local time.

About this time, the *Post Champion* radioed Key West that she had sighted another

---

Gorda. For reasons that will appear in the text, following, we deem these circumstances of no weight in assessing the Government's case against Sanchez.

**2.** Both Captain Williams and Officer Frewer testified by deposition.

fishing vessel, the *Harriett Hope*, and that she would overtake her in order to open up communications between the *Harriett Hope* and Key West. After radio communications were established between the *Harriett Hope* and Key West, it was agreed that the *Harriett Hope* would sail the seven or eight miles to the site of the *Letty* and mark her position while awaiting the arrival of the Coast Guard. The Coast Guard Cutter *Point Thatcher* had been dispatched to the scene but wasn't expected to arrive until sometime between 8:00 and 9:00 p. m. Kenneth Janusik, the operator of the *Harriett Hope*, testified that he arrived at the location of the vessel "just before dark," sometime between 5:30 and 5:45 p. m. He testified further that he and his mate did not board the *Letty* at any time and did not notice any other vessels from the time of the sighting of the *Post Champion* until the *Point Thatcher* arrived at about 8:00 p. m.

When the *Point Thatcher* arrived the *Harriett Hope* was standing by. A boarding party went aboard the *Letty* to measure the extent of damage and the chances for salvage. A rear hold was entered first to inspect for hull damage. The hold was filled with "bales" of what "field" tests later indicated to be marijuana. The party proceeded to the cabin, through the floor of which passed a scuttlehatch to the engine compartment below. This hatch was open. Through the open hatch Seaman Boehmer could see that the water level in the engine compartment had risen somewhat higher than when last seen by Officer Frewer of the *Post Champion*. He could see something more as well: two or three bales, floating next to the engine itself. His reaction to the smell emanating from the engine compartment was considerably stronger than was Officer Frewer's, comparing the odor to that of "rotten hay." Two

forward holds were also filled with bales. The pumps of the *Point Thatcher* were then used to dewater the *Letty*, and she was towed into the Port of Tampa Bay. Testimony of the DEA agents in charge of the unloading of the *Letty* showed that it took a crew of ten men and a foreman at least three and one–half hours to unload the cargo at dockside. The bales numbered 385 in all and weighed 31,970 pounds.

The Government's evidence effectively placed the cargo on board the *Letty* as of the time of the rescue, and here the element of time is critical. The *Post Champion* left the *Letty's* position at approximately 2:00 p. m. The *Harriett Hope* arrived less than four hours later, no later than 5:45 p. m. The jury was entitled to credit Janusik's testimony that he neither boarded the *Letty* nor saw any other vessels approaching or leaving the scene. At no point during the time in question was his boat, the *Harriett Hope*, more than seven or eight miles from the *Letty*. The jury might reasonably infer that any post–rescue surreptitious loading of the sinking vessel, a job that took at least three and one–half hours under more favorable portside conditions, would have been observed at some point by Janusik.

As the trial court realized, however, proof that the cargo was on board at the time of the rescue was not enough. At most this evidence proved no more than knowing possession of the cargo as of the time of the rescue,[3] but it supported no inferences as to how the defendants came into that possession, whether either "knowingly" or "willfully" within the meaning of the conspiracy charged in the indictment. If the defendants' statement to those on board the *Post Champion* that they had been adrift for five days is entitled to any credit, that still left a gap of two full days in the Government's

---

**3.** If, as the jury was authorized to conclude, the cargo was on board the *Letty* as of the time of rescue, the defendants must have been aware of that fact. They had been adrift for five days, without food for two, taking on water, and were without power for pumps or radio communications. Although the living quarters were all above deck and the bales as found by the Coast Guardsmen were all under cover below deck, it is inconceivable that the circumstances related would not have led them to discover and appreciate the nature of their cargo.

proof. Sometime after the *Letty* left Punta Gorda she took on the marijuana, and sometime before the rescue the defendants manned her. We need not consider the district court's conclusion that a reasonably minded jury must necessarily have entertained a reasonable doubt as to the knowing complicity of crew members Suarez and Angel in the conspiracy that was so obviously afoot.

Sanchez, however, was identified as the *Letty's* skipper, and it was this additional fact, and this alone, on which the trial court let the case against him go the the jury. In sum, the evidence that Sanchez was in charge of the *Letty* was as follows: (1) the *Post Champion* radioman's "testimony" identified him as the operator; (2) Captain Williams identified him by name as the skipper and further identified him as the crew member who went back on board the *Letty* to open up her valve; and (3) Officer Frewer remembered that the skipper (whose name he didn't recall) was the crew member who opened the valve before leaving the *Letty*. The sole issue on this appeal then is whether a reasonably minded jury must necessarily have entertained a reasonable doubt as to the skipper of the *Letty's* complicity in the conspiracy charged.[4]

Relying heavily on our decision in *Reyes, supra*, appellant argues that guilty intent cannot be inferred from proximity to the crime's commission nor by mere association with those who are members of the conspiracy. Many of our cases contain language to that effect.[5] From the evidence that he was the skipper of the *Letty*, however, we think the jury was authorized to find more than Sanchez' mere proximity to or association with the members of the conspiracy. He was in charge of a vessel that was filled to the decks with contraband. The jury could reasonably conclude that he would neither assume command of a vessel already so laden, nor remain in command after such a cargo had been taken on board, unless he did so with the specific and willing intent to further the object of the conspiracy.

In contrast, *Reyes* reversed the convictions of four undocumented Colombian aliens who had flown into this country in a plane which had discharged its cargo of marijuana before landing. The evidence proved no more than that they were passengers on the plane. Although the evidence strongly suggested that one or more of the passengers helped to jettison the cargo and conceal its former presence on board before they were apprehended by the authorities, that evidence was not specific as to any one of the passengers. However, the *Reyes* court did not have before it the appeal of the pilot of that plane, who had absconded while on bond, 595 F.2d at 277, n. 1; it therefore had no occasion to assess the inference of guilty intent on the part of the pilot that might be drawn from the fact that he was in command of the plane and its obvious cargo. After thus summarizing the evidence against the passengers, *Reyes* concluded that "[t]his was insufficient to show beyond a reasonable doubt their participation in a conspiracy to import marijuana, or guilt of the substantive crime *accomplished by their co-defendant*, Campbell

---

4. Sanchez' contention that the acquittal of co-defendants Angel and Suarez necessitated his acquittal in the absence of proof of the identification of any other co-conspirator is without merit. The indictment charged the complicity of "other persons to the Grand Jury unknown," and the evidence provided more than ample justification for the conclusion that persons other than just those found on board with the cargo were involved in the conspiracy that had gotten that cargo that far.

5. *See, e. g., United States v. Gordon*, 580 F.2d 827, 835 (5th Cir. 1978), *cert. den.*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711; *United States v. Littrell*, 574 F.2d 828, 833 (5th Cir. 1978); *United States v. Dyar*, 574 F.2d 1385, 1389 (5th Cir. 1978), *cert. den.* 439 U.S. 982, 99 S.Ct. 570, 58 L.Ed.2d 633; *United States v. Ritz*, 548 F.2d 510, 522 (5th Cir. 1977); *United States v. Morrow*, 537 F.2d 120, 134 (5th Cir. 1976), *cert. den.*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806; *United States v. Sanchez*, 508 F.2d 388, 393 (5th Cir. 1975), *cert. den.* 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44.

[the pilot]." *Id.,* at 280 (emphasis added). Under the particular circumstances of this case, therefore, we think that the jury's conclusion that Sanchez had guilty intent beyond a reasonable doubt was itself reasonable.

AFFIRMED.