UNITED STATES of America,
Plaintiff-Appellee,

v.

Andrew GRAY, Paul Thomas Nelson and
Geoffrey Christian Knapp,
Defendants-Appellants.

No. 80–5469.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Oct. 26, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

John M. Edman, Petersburg, Fla., for defendants-appellants.

Terrance A. Bostic, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before MORGAN, KRAVITCH and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellants Andrew Gray, Paul Thomas Nelson, and Geoffrey Christian Knapp were convicted by a jury of importing and conspiring to import a controlled substance in violation of 21 U.S.C. §§ 952 and 963. On appeal they contend: 1) that the district court lacked jurisdiction, 2) that the district court erred in denying motions to suppress physical evidence and statements made prior to appellants being given *Miranda* warnings, 3) that the district court erred in admitting co-conspirator's statements, and 4) that the evidence was insufficient to convict the appellants on the conspiracy charge. We reject these contentions and affirm appellants' convictions.

### I. Background

On March 15, 1980, the Coast Guard cutter DEPENDABLE sighted the sailing vessel MYSTAR approximately 100 miles west of Fort Myers, Florida. After observing that the vessel appeared headed for the United States, the DEPENDABLE's commander, Howard Gehring, ordered the cutter to move closer to the MYSTAR so that he could contact its crew by loudhailer. Gehring asked the sole person on deck, appellant Gray, his last port of call, his next port of call, his home port, whether he was sailing solo, and whether he was carrying cargo. Gray responded that his last port of call was Cozumel, Mexico; that his next port of call and also his home port was Clearwater, Florida; and that he was sailing solo and carried no cargo.

Despite Gray's statements, Gehring observed that the ship lacked proper homeport identification and was not rigged for solo sailing.[1] In addition, he noticed that the MYSTAR's swimming platform was awash and that the vessel did not keel despite 20–22 knot winds, indicating that the ship was heavily laden with cargo. Gehring then advised Gray that he intended to board the MYSTAR.

The officer in charge of the boarding party, Ensign Duerr, showed Gray Coast Guard form 4100, the standard boarding form, and informed Gray that he was going to conduct a safety inspection of the ship. On a sweep of the ship prior to completing this inspection, Duerr discovered a compartment, apparently locked from the inside, later identified as the crew's quarters. Gray told Duerr that the compartment had been locked by the owner of the vessel prior to the ship's departing Cozumel, and that he had no way to open the compartment. Duerr then went back up on deck and attempted to peer in the room from the topside portholes, but found them all curtained. He next contacted Commander Gehring to advise him of the situation and request instructions; Gehring told the ensign to try to find another means to see into or gain access to the compartment. Shortly after this conversation another member of the boarding party told Duerr he had seen three pairs of different sized shoes, indicating other persons had been on board.

Following Gehring's orders, Duerr asked Gray if there was some other way to see into the compartment. Gray directed the ensign to the engine room and told him that he might be able to see into the room up through the bilges. Once in the engine room, Duerr detected the odor of marijuana, and again contacted Gehring for instructions; he told Duerr to continue his efforts to gain access to the compartment. The boarding party, with Gray's help,[2] disassembled the lock but failed to gain entry. Gehring then sent two additional crewmen to assist in opening the door. One picked the lock, but the boarding party could only open the door a few inches before it would slam shut. After two unsuccessful attempts to open the door, Gray told the boarding party that two men were in the compartment; he then directed these men to come out. Ensign Duerr looked into the compartment, saw bales of marijuana, and arrested Gray and the two other men.

At trial the defendants moved to suppress the marijuana evidence as fruit of an illegal search, and also moved to suppress the statements made by Gray during his initial conversation with Commander Gehring. The trial court denied both motions. Appellants subsequently were convicted and sentenced to prison terms.

## II. Jurisdiction

■ As a threshold question we must consider appellants' argument concerning federal jurisdiction: that because no overt act of the conspiracy occurred within the territorial limits of the United States, federal courts lacked jurisdiction.

This court recently addressed this issue and directly held that federal courts have jurisdiction over drug conspiracy cases as long as the evidence indicated the defendants intended to consummate the conspiracy within the territorial boundaries of the United States. *United States v. DeWeese*, 632 F.2d 1267, 1271 (5th Cir. 1980); *United States v. Ricardo*, 619 F.2d 1124, 1129 (5th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980); *United States v. Mann*, 615 F.2d 668, 671 (5th Cir. 1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). The evidence here indicated the defendants so intended. Commander Gehring, qualified as an expert in ocean navigation, testified at trial that the MYSTAR was headed for Florida; and appellant Gray stated in his initial conversation with Gehring that his next port of call and home port was Clearwater, Florida. We conclude that this evidence alone provided a basis for asserting federal jurisdiction over this case.

---

1. The MYSTAR also was not equipped with a radar reflector, which, although not a required safety item, would have been a prudent addition for someone sailing solo.

2. Gray provided the tools to take the lock apart, and according to Ensign Duerr's testimony at the suppression hearing, also physically helped disassemble the lock.

### III. The Motion to Suppress Physical Evidence

Appellants contend that the search of the living quarters violated the crew's fourth amendment rights, and therefore the trial court should have suppressed the marijuana evidence. Appellants concede that this court's decision in *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), gives the Coast Guard absolute authority to stop and board a United States vessel on the high seas to perform a safety and documentary inspection. *See United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (en banc). Appellants argue, however, that the safety inspection of the ship ended prior to the time Ensign Duerr went down to the engine room to attempt to peer into the locked living quarters. According to appellants, the actions taken by Duerr after finding the locked compartment constituted a "search" of the compartment. Appellants, moreover, note that neither *Warren* nor *Williams* gave the Coast Guard plenary authority to search all areas of a ship without suspicion of criminal activity,[3] and *Williams* specifically did not decide what level of suspicion is necessary for the Coast Guard to search the living quarters of the crew. Appellants assert that such a search requires probable cause, and that probable cause was lacking at the time this search began. The government, on the other hand, contends that probable cause existed when the search began; and, even if probable cause did not exist, asserts that a safety inspection includes the right for the Coast Guard to make a cursory inspection of all areas of the ship, including locked living quarters.

We find it unnecessary to reach the issue, left open in *Williams*, of what minimum degree of suspicion is necessary for the Coast Guard to "search"[4] the living quarters of a vessel, because we find that the Coast Guard had probable cause to search the compartment for contraband prior to the time the "search" began. Nor must we decide if a "safety inspection" includes the right to make a cursory search of locked living quarters, because we conclude that the probable cause developed during a valid safety inspection.[5]

■ Probable cause to search a vessel exists when "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe the [vessel] contains contraband." *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978) (dealing with probable cause for search of an automobile). *See United States v. Weinrich*, 586 F.2d 481, 492 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979) (citing the *Edwards* standard for a search of a vessel). Probable cause, moreover, "is the sum total of layers of information. . . . We weigh not the individual layers but the 'laminated' total." *Edwards, supra* at 895, quoting *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966). *See Weinrich, supra*, at 492.

■ Here the facts showed that the MYSTAR, heading from Mexico to the United States, lacked proper home port identification, and despite appellant Gray's protestations to the contrary, was obviously carrying some sort of cargo. Gray also told Commander Gehring that he was solo-sailing, but the vessel was not properly rigged for solo-sailing. Once on board, the Coast Guard had the right to conduct a cursory investigation of the open areas of the ship for possible safety violations. When this inspection revealed no heavy cargo, but a locked compartment, suspicion naturally fo-

---

3. *Williams* specifically held that assuming a valid privacy interest existed in areas of the hold, "reasonable suspicion" was required to search those areas. 617 F.2d at 1088. *But see United States v. DeWeese*, 632 F.2d 1267 (5th Cir. 1980) (captain and crew of a ship have no privacy interest in ship's ice hold).

4. We use "search" in this opinion to refer to an activity which intrudes on protected fourth

amendment interests beyond the intrusion of a "safety inspection."

5. *Cf. United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) ("cursory search" of ship pursuant to safety inspection included search of captain's living quarters).

cused on it. Added to this mix of circumstances was appellant Gray's statement that the owner of the vessel had locked the compartment prior to the ship's departure from Cozumel [6] and had failed to give even the ship's captain access to the room. As we noted in *Warren*, if during the course of a safety inspection circumstances arise which generate probable cause, the Coast Guard may "conduct searches, seize evidence, and make arrests." *Warren, supra*, at 1065. We conclude, viewing the totality of the suspicious circumstances including finding the locked compartment and appellant Gray's statement concerning access to the room, that probable cause to search the compartment for contraband arose at this time.

 Unfortunately, our conclusion that probable cause existed after appellant Gray's statements concerning the compartment is muddled by the testimony of Commander Gehring at the suppression hearing that he did not personally believe probable cause existed until much later.[7] While we are troubled by the testimony of a law enforcement official that he admittedly conducted a search without personally believing probable cause existed, this court previously has indicated that a reviewing court should nonetheless determine the existence of probable cause by an objective standard. *United States v. Clark*, 559 F.2d 420, 425 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) ("[E]ven if the officers felt that probable cause was lacking, an objective standard would still be applicable."). *See United States v. Resnick*, 455 F.2d 1127, 1132 (5th Cir. 1972) ("[T]he scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer."). Although we recognize that the exclusionary rule serves mainly as a deterrent to police misconduct, we conclude that conduct which in fact does not violate the strictures of the fourth amendment cannot come within the scope of the rule. Moreover, we note that Commander Gehring testified that he was aware of the facts which constituted probable cause.[8] We find,

---

**6.** While this statement apparently would raise the issue of standing to contest the illegal search under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and its successor cases *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) and *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the issue was not raised on appeal. *See Steagald v. United States*, 451 U.S 204, 210 n.5, 101 S.Ct. 1642, 1646 n.5, 68 L.Ed.2d 38 (1981) (standing issue waived by government's failure to raise it).

**7.** At the suppression hearing Commander Gehring testified on cross examination:

Q All right, sir. So that was then when you had—if I might put it another way—probable cause to believe that there was contraband on the vessel?
A The probable cause to believe there was contraband on board the vessel developed right up to the time they discovered the contraband, sir.
Q Right at the time, you say?
A Right up to the time.
　　*　*　*　*　*　*
Q When did you finally conclude that there was probable cause?
A When they actually were in the compartment and they found the contraband. At that time there was a "roach" or—excuse me—a butt in one of the ashtrays on board the vessel. It could have been just residue

from someone having smoked it on board. There is no U. S. law that I am aware of for a U. S. citizens smoking marijuana on the high seas. So that was—it was just another thing that I said "Okay, so they smelled marijuana."

There were other things that they noticed—multiple pairs of shoes on board, different sizes. One man on board the vessel. That starts to make you wonder if there is probably more people on board.
Q All right. Anything else, now, that went into the probable cause?
A It really didn't develop any probable cause, as I indicated, that there was any marijuana until such time as they had actually got into the space or cracked the door and the admission by the claimed master of the vessel, Mr. Gray, "Congratulations. There's men back there. I don't want anybody hurt."

And from that standpoint—then at that point, okay. Now, we've got a probable cause that developed in my own mind.
We should note, however, in a rather bizarre twist, that the defense steadfastly maintained that Commander Gehring had probable cause to arrest even prior to the initial boarding of the MYSTAR.

**8.** We caution law enforcement officials, however, that one factor assessed by the courts in deciding whether probable cause in fact existed is the cumulative experience of the officials

therefore, that the facts supported probable cause despite Commander Gehring's subjective belief, and hold that the trial court properly denied appellant's motion to suppress.[9]

## IV. The Motion to Suppress Statements

■ Appellants also claim that the trial court erred in denying their motion to suppress appellant Gray's statements concerning his ports of call, solo-sailing, and lack of cargo made during his initial conversation with Commander Gehring and repeated to Ensign Duerr upon his boarding of the MYSTAR. Appellants argue that the statements are inadmissible because the Coast Guard failed to first give Gray his *Miranda* warnings. This contention is without merit. In *United States v. Warren*, 578 F.2d 1058, 1070 (5th Cir. 1978) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), this court squarely held that the Coast Guard's routine stop, boarding, and inspection of an American vessel on the high seas does not create a custodial situation necessitating *Miranda* warnings.[10] *See United States v. Jonas*, 639 F.2d 200, 203–204 (5th Cir. 1981); *United States v. Postal*, 589 F.2d 862, 887 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). Because appellant Gray's statements occurred at the initial routine stop and boarding, we find that *Warren* controls, and that the suppression motion was properly denied.

## V. Admission of Co-Conspirator's Statements

■ Appellants Nelson and Knapp contend that the trial court erred in admitting the statements of appellant Gray against them under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). Appellants urge that sufficient independent evidence of a conspiracy did not exist and that no evidence linked Nelson and Knapp with a conspiracy.

This court in *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) delineated the standards applicable to admission of co-conspirators' statements. To admit the statements initially, the trial court must find by substantial independent evidence that a conspiracy existed, that the statements were made in furtherance of the conspiracy,[11] and that the defendants against whom the statements were admitted were part of the conspiracy. *James, supra*, at 580–81. Upon proper motion at the close of all the evidence, the trial court must conclude that the prosecution has shown those same three criteria by a preponderance of the evidence. *Id.* at 582–83. *See United States v. Berry*, 644 F.2d 1034, 1038 (5th Cir. 1981).

We hold that the trial court properly admitted the co-conspirator's statements. The evidence showed that a sailing vessel, headed for the United States from Mexico contained over four tons of marijuana in open bales. The vessel had three men on board, two of whom had locked themselves

---

involved in the search, *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978); in a close case, the denial by those officials that probable cause existed may well tip the balance toward a finding of no probable cause.

9. The appellants did not raise the issue whether a warrant was necessary to conduct a search of this type.

10. The court in *Warren*, however, could not decide the case on this ground because the appellants claimed the statements occurred after the routine boarding and safety inspection had ended. The court, therefore, was compelled to examine the case under the Fifth Cir-

cuit's four-factor test of whether interrogation occurred in a custodial context. As we stated in *Warren*, these factors are (1) whether probable cause to arrest had arisen, (2) whether the subjective intent of the officer conducting the interrogation was to hold the defendant, (3) whether the subjective belief of the defendant was that his freedom was significantly restricted, and (4) whether the investigation had focused on the defendant at the time of the interrogation. *Warren, supra*, at 1070–71.

11. Appellants do not contest that the statements were made in furtherance of the conspiracy.

inside the room with the marijuana and apparently had resisted attempts by the Coast Guard to open the door to that room. We conclude that these facts provided both substantial evidence and proof by a preponderance[12] that a conspiracy existed and that defendants Knapp and Nelson were connected with it. *See United States v. Mazyak*, 650 F.2d 788 (5th Cir. 1981) (length of voyage, quantity of contraband, close connection between captain and crew supported conspiracy guilty verdict, citing *United States v. DeWeese*, 632 F.2d 1267 (5th Cir. 1980)).

### VI. Sufficiency of the Evidence

Appellants Nelson and Knapp further argue that the evidence showed only their "mere presence" on board with the contraband, and that under Fifth Circuit precedent such presence is insufficient to convict them of conspiracy. They rely primarily on this court's decision in *United States v. Reyes*, 595 F.2d 275 (5th Cir. 1975) in which we held that the "mere presence" of four illegal aliens on board an aircraft flying contraband into the United States was insufficient to prove their knowing participation in a drug conspiracy. Because this case is distinguishable from *Reyes*, we reject appellants' sufficiency argument.

The test for reviewing sufficiency claims is whether, viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942), substantial evidence exists to support the verdict. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) quoting *Glasser supra*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Berry*, 644 F.2d 1034, 1039 (1981). This court has interpreted the "substantial evidence" test as evidence which would permit a reasonable jury to find guilt beyond a reasonable doubt, *United States v. Fox*, 613 F.2d 99, 101 (5th Cir. 1980), or, alternatively, evidence such that a reasonable jury could conclude was inconsistent with every reasonable hypothesis of innocence. *Berry, su-*

pra, at 1039. In *Reyes* we concluded that the evidence failed to meet this test because the government did not produce any evidence of an active role in the conspiracy by the four passengers. Although the government hypothesized that one or more of the passengers could have helped in the conspiracy, an equally plausible explanation was that the aliens were a "second cargo" for the drug-running plane.

In contrast to *Reyes*, here the government presented direct evidence which inferentially pointed to appellants' participation in the conspiracy. Ensign Duerr testified to the effect that in his opinion Knapp and Nelson attempted to keep the Coast Guard from entering the compartment by pushing against the door. In addition, the evidence showed that Knapp and Nelson had locked themselves inside a room nearly completely filled with marijuana bales, a rather suspicious action for which no plausible explanation appears. Viewing the record as a whole, we find that ample evidence existed to support the verdict.

AFFIRMED.

---

**12.** The defense rested at the close of the government's case. Hence, no contrary evidence was introduced.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.